## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

BRUCE A. ESTES,

               Plaintiff,

  v.

VIRGINIA DEPARTMENT OF
CORRECTIONS; RIVER NORTH
CORRECTIONAL CENTER; HAROLD W.
CLARKE, Director of Corrections in the
Commonwealth of Virginia; A. DAVID
ROBINSON, Chief of Corrections Operations
in the Commonwealth of Virginia; H.
PONTON, Western Regional Director of
Corrections in the Commonwealth of Virginia;
JOHN WALRATH, Warden of River North
Correctional Center; JESSICA KING,
Operations Manager of River North
Correctional Center; and BRIAN HALL,
Institutional Programs Manager of River North
Correctional Center,

               Defendants.

Civil Action No.  7:15-cv-00155

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Cynthia Akatugba
(Virginia Bar No. 88967)
MORRISON & FOERSTER LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102
Telephone: 703.760.7700
Facsimile:  703.760.7777
E-mail: cakatugba@mofo.com

Joel C. Haims (admitted *pro hac vice*)
Steven T. Rappoport (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900
E-mail: jhaims@mofo.com
E-mail: srappoport@mofo.com

*Attorneys for Plaintiff Bruce A. Estes*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ESTES' COUNTERSTATEMENT OF UNDISPUTED FACTS..................................3

LEGAL STANDARD ................................................................................................3

ARGUMENT .............................................................................................................4

I.   DEFENDANTS FAIL TO ESTABLISH THAT THEY HAVE NOT
     SUBSTANTIALLY BURDENED MR. ESTES' RELIGIOUS EXERCISE ..................5

     A.   Defendants Fail to Establish that Common Fare Food Is Kosher .........................5

     B.   Defendants' Other Restrictions Also Substantially Burden Mr. Estes................12

          1.   Shofar ................................................................................................12

          2.   Fast Days ...........................................................................................13

II.  DEFENDANTS FAIL TO SHOW A COMPELLING GOVERNMENT
     INTEREST ............................................................................................................14

     A.   Defendants Fail to Establish that Cost Is a Compelling Government
          Interest Sufficient to Deny Mr. Estes Kosher Food ................................................14

     B.   Defendants' New Claims of Administrative Burden Fail to Establish a
          Compelling Government Interest ..........................................................................21

     C.   Defendants Have Proffered No Compelling Government Interest to Satisfy
          VADOC's Other Restrictions on Religious Exercise ............................................22

III. DEFENDANTS FAIL TO ESTABLISH THAT THEY USE THE LEAST
     RESTRICTIVE MEANS .......................................................................................23

          1.   Prepackaged Kosher Meals Are a Cost-Effective and Reasonable
               Accommodation for Estes' Dietary Requirements ...................................23

          2.   Defendants Fail to Establish That VADOC Uses the Least
               Restrictive Means as to Its Other Religious Restrictions ........................25

IV.  DEFENDANTS' EFFORT TO LIMIT DAMAGES AND LIABILITY FAILS ............26

V.   MR. ESTES' CLAIMS RELATING TO PRAYER AND STUDY................................28

CONCLUSION ........................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al-Amin v. Shear*,
  325 F. App'x 190 (4th Cir. 2009) ....................................................................... 5, 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................................. 3

*Coleman v. Jabe*,
  No. 7:11cv00518, 2012 WL 7801722 (W.D. Va. Dec. 26, 2012) ............................ 5

*Cooper v. Lanham*,
  No. 97-7183, 1998 WL 230913 (4th Cir. May 7, 1998) ......................................... 19

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005) .................................................................................................. 4

*DePaola v. Virginia Dep't of Corr.*,
  No. 7:12-CV-00592, 2014 WL 3956108 (W.D. Va., Aug. 12, 2014) ..................... 20

*Evans v. Techs. Applications. & Serv. Co.*,
  80 F.3d 954 (4th Cir. 1996) .................................................................................... 18

*Garner v. Kennedy*,
  713 F.3d 237 (5th Cir. 2013) ............................................................................ 15, 17

*Hall v. Klemm*,
  No. 15-20, 2017 WL 913803 (W.D. Pa. Mar. 7, 2017) .......................................... 16

*Hayes v. Bruno*,
  171 F. Supp. 3d 22 (D. Conn. 2016). ..................................................................... 11

*Hudson v. Dennehy*,
  538 F. Supp. 2d 400 (D. Mass. 2008) ..................................................................... 25

*Jones v. Comm'r, Indiana Dep't of Corr.*,
  No. 1:16-cv-2887-WTL-MJD, 2017 WL 3398002 (S.D. Ind. Aug. 8, 2017) ......... 24

*Knight v. Thompson*,
  797 F.3d 934 (11th Cir. 2015) ................................................................................ 15

*Koger v. Bryan*,
  523 F.3d 789 (7th Cir. 2008) .................................................................................. 15

*Lebaron v. O'Brien*,
  No. 15-00275, 2016 WL 5415484 (Mass. Super. Ct. June 15, 2016) ....................................24

*Lovelace v. Lee*,
  472 F.3d 174 (4th Cir. 2006) ...................................................................................12, 19, 27

*Maldonado v. Ramirez*,
  757 F.2d (3rd Cir. 1985) ...........................................................................................18

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
  703 F.3d 781 (5th Cir. 2012) .............................................................................5, 15, 18

*Muhammad v. Mathena*,
  No. 7:14-CV-00134, 2015 WL 300363 (W.D. Va. Jan. 22, 2015) .........................................20

*Muhammad v. Wheeler*,
  171 F. Supp. 3d 847 (E.D. Ark. 2016) ..................................................................................24

*Nelson v. Miller*,
  570 F.3d 868 (7th Cir. 2009) .................................................................................................5

*Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*,
  840 F.2d 236 (4th Cir. 1988) .................................................................................................3

*Schlemm v. Wall*,
  784 F.3d 362 (7th Cir. 2015) ...............................................................................................15

*Sherbert v. Verner*,
  374 U.S. 398 (1963) .............................................................................................................23

*Shilling v. Crawford*,
  536 F. Supp. 2d 1227 (D. Nev. 2008) ..................................................................................25

*Smith v. Perlman*,
  658 F. App'x 606 (2nd Cir. 2016) ........................................................................................19

*Toler v. Leopold*,
  No. 2:05-CV-82 JCH, 2008 WL 926533 (E.D. Mo. Apr. 3, 2008) .......................................24

*Tuller v. Braxton*,
  No. 7:02-CV-01297, 2004 U.S. Dist. LEXIS 30652 (W.D. Va. Sept. 17, 2004)...................11

*United States v. Diebold, Inc.*,
  369 U.S. 654 (1962) ...............................................................................................................3

*United States v. Playboy Entm't Group, Inc.*,
  529 U.S. 803 (2000) .............................................................................................................23

*United States v. Sec'y, Fla. Dep't of Corr.*,
   828 F.3d 1341 (11th Cir. 2016) ................................................................................5, 15, 24

*Williams v. Wilkinson*,
   645 F. App'x 692 (10th Cir. 2016) ..........................................................................................5

*Wilson v. McPeak*,
   No. 7:15-CV-00175, 2016 WL 676584 (W.D. Va. Feb. 18, 2016).......................................19

**Statutes**

42 U.S.C. § 2000cc-3(g).................................................................................................................4

Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a) .........................4

Virginia Religious Freedom Restoration Act, Va. Code § 57-2.02...........................................4, 27

**Other Authorities**

U.S. CONST. amend. I ...........................................................................................................2, 19, 20

Fed. R. Evid. 701 ...........................................................................................................................9

Fed. R. Evid. 702 .........................................................................................................................10

## PRELIMINARY STATEMENT

Defendants claim that there is no dispute that they provide inmates at River North Correctional Center ("River North"), including Plaintiff Bruce A. Estes, kosher food and, thus, they are entitled to summary judgment that Mr. Estes' exercise of his Orthodox Jewish religion is not substantially burdened. But Defendants base their outlandish assertion that River North's common fare menu is kosher on the testimony of a belatedly-disclosed rabbi of unknown background or denomination who allegedly "inspected" River North and deemed it to be kosher. Not only is the testimony of Defendants' rabbi improper because it is late and was never previously disclosed, it is irrelevant because the only opinion that matters with respect to whether the common fare menu at River North is kosher is the opinion of an Orthodox rabbi, and Defendants have failed to show that their rabbi is Orthodox (or, indeed, a rabbi at all). By contrast, Mr. Estes' expert—Yossel Kranz—*is* an Orthodox rabbi and has concluded, based in large part on information provided by Defendants and their witnesses, that the common fare menu *is not* kosher. Both testimony from Defendants' witnesses and pictures produced by Defendants also establish that the common fare program is unkosher. Although Mr. Estes believes he is entitled to summary judgment based on the unrebutted testimony of Rabbi Kranz alone, in the event the Court considers Defendants' rabbi's testimony, an issue of fact would exist concerning whether the common fare menu is kosher, precluding summary judgment for Defendants.

Beyond Defendants' inability to show that Mr. Estes' religious exercise is not substantially burdened, they argue that the supposed—but unproven—increased cost of providing prepackaged kosher meals to Mr. Estes and other inmates satisfies a compelling government interest and is therefore justifiable under RLUIPA and Virginia RFRA. But, as Mr. Estes showed in his own Motion for Summary Judgment, and as set forth below, cost is not a

compelling government interest.  Unable to argue otherwise, Defendants erroneously cite cases applying the lower "legitimate government interest" standard applicable for First Amendment and certain other claims, ignoring that RLUIPA was purposefully drafted to provide a greater level of protection to inmates' religious rights than the Constitution provides and is, therefore, subject to strict scrutiny that requires a showing of a compelling government interest.  Even if Defendants were not wrong on the law—and they are—they fail to put the alleged additional costs of providing kosher meals in any kind of context from which this Court could determine whether the cost is so substantial as to be compelling.  Likewise, Defendants make generalized claims of increased administrative burden, but are once again done in by the testimony of their own witnesses, who affirm that kosher food, as well as the proper observance of certain fast days, can be accommodated.

Finally, almost as an afterthought, Defendants assert that the common fare menu is the least restrictive means of achieving Defendants' supposedly compelling government interest with respect to costs.  But Defendants do not establish that their failure and refusal to provide kosher meals to Mr. Estes is the least restrictive means of achieving that goal.  Defendants fail to show that they even considered another less restrictive alternative, beyond providing two cost estimates for prepackaged kosher entrees.  At a minimum, Defendants have created an issue of fact as to whether there are less restrictive alternatives to the common fare plan that would satisfy Defendants' purported compelling government interests.  Defendants also do not even attempt to argue that their failure to permit Mr. Estes to observe a few additional fast days is the least restrictive means, and their proposal to allow Jewish inmates to hear the recorded blasts of a Shofar on the high holy days, in lieu of hearing actual blasts out of a manufactured security concern, does not comply with Jewish law.

In short, Defendants have told the Court that the common fare menu is "kosher enough" and that their other restrictions on Mr. Estes' religious exercise are also justifiable.  But RLUIPA and Virginia RFRA demand more than "kosher enough," and the record before the Court reflects that Defendants do not meet that standard.  Defendants have therefore failed to establish that they are entitled to summary judgment, and their motion should be denied.

## ESTES' COUNTERSTATEMENT OF UNDISPUTED FACTS

In the interests of space, Mr. Estes respectfully directs the Court to Exhibit A to the Declaration of Steven T. Rappoport, dated September 26, 2017 ("Rappoport 2nd Decl.") for Mr. Estes Counterstatement of Undisputed Facts, which is the same as his Statement of Undisputed Facts in his Motion for Summary Judgment.  (Dkt. No. 121.)

## LEGAL STANDARD

Summary judgment is appropriate where, "viewing the evidence in the light most favorable to the nonmoving party, 'there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.'"  *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 239-40 (4th Cir. 1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  The party seeking summary judgment bears the initial burden of coming forward and demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof," the moving party may discharge its summary judgment obligations "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**ARGUMENT**

Congress unanimously passed the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § 2000cc-1(a), to eliminate "unnecessary" barriers to religious exercise.

*Cutter v. Wilkinson*, 544 U.S. 709, 715-16 (2005).  Under the RLUIPA,

> No government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution … even if the burden results from
> a rule of general applicability, unless the government demonstrates that
> imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental
> interest.[1]

42 U.S.C. § 2000cc-1(a).  RLUIPA specifically provides that it "shall be construed in favor of a

broad protection of religious exercise, to the maximum extent permitted by the terms of this

chapter and the Constitution."  42 U.S.C. § 2000cc-3(g).

As set forth below, Defendants fail to establish that there are no genuine issues of

material fact and that they are entitled to judgment as a matter of law as to whether (i) Mr. Estes'

religious exercise has been substantially burdened by Defendants' conduct, (ii) Defendants'

policies further a compelling government interest, and (iii) Defendants have used the least

restrictive means in satisfying that interest.  Defendants also make several arguments to limit

damages and liability, none of which have merit.

---

[1] The Virginia Religious Freedom Restoration Act ("Virginia RFRA"), VA. CODE ANN. § 57-2.02 (2014),
applicable to the individual Defendants, provides, similar to RLUIPA, that "[n]o government entity shall
substantially burden a person's free exercise of religion even if the burden results from a rule of general
applicability unless it demonstrates that application of the burden to the person is (i) essential to further a
compelling governmental interest and (ii) the least restrictive means of furthering that compelling
governmental interest."  Because the RLUIPA and Virginia RFRA are virtually identical, the Court
should apply the same standard to Mr. Estes' Virginia RFRA claims as it applies to his RLUIPA claims.

# I.     DEFENDANTS FAIL TO ESTABLISH THAT THEY HAVE NOT SUBSTANTIALLY BURDENED MR. ESTES' RELIGIOUS EXERCISE.

## A.     Defendants Fail to Establish That Common Fare Food Is Kosher.

Defendants do not dispute that Mr. Estes' religious beliefs demand that he eat kosher food.  The Fourth Circuit, along with many other courts, has ruled that denial of kosher food places a substantial burden on religious exercise for the simple reason that it gives Mr. Estes the choice of violating his religious practices or not eating.  *See Al-Amin v. Shear*, 325 F. App'x 190, 194 (4th Cir. 2009) ("Assuming that Al-Amin's religion requires him to eat Kosher food, the denial of such food for a month would constitute a substantial burden.  Essentially, he would face the choice of violating a religious tenet or going without food.").  *Coleman v. Jabe*, No. 7:11cv00518, 2012 WL 7801722, at *23 (W.D. Va. Dec. 26, 2012) (holding that VADOC's failure to provide a Muslim inmate with a halal diet was a substantial burden on the plaintiff's religious exercise because it created "a Hobson's choice of eating a non-Halal diet in violation of [plaintiff's] sincerely held religious beliefs or going without food"), *report and recommendation adopted in relevant part*, No. 7:11cv00518, 2013 WL 1209014 (W.D. Va. Mar. 25, 2013).[2]  Here, relying on the untimely and unreliable declaration of a fact witness rabbi of unknown background, defendants argue that Mr. Estes' religious exercise is not being substantially burdened because he is "receiving food that is purchased, maintained, prepared, and served in

---

[2] Other Circuit Courts agree.  *See, e.g.*, *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 793 (5th Cir. 2012), *as corrected* (Feb. 20, 2013) ("Denying all access to kosher food places a substantial burden on the practice of an inmate's faith."); *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341, 1346 (11th Cir. 2016) ("The Secretary concedes that the United States met its burden of proving that the denial of kosher meals is 'a substantial burden on the religious exercise' of a prisoner in the custody of the Secretary.") (quoting RLUIPA); *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009) ("We have held that a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition"); *Williams v. Wilkinson*, 645 F. App'x 692, 702 (10th Cir. 2016) ("the failure to provide Mr. Williams with a kosher diet will either prevent him from exercising his sincerely held religious belief or force him to make the Hobson's choice of eating a diet contrary to his beliefs or not eating at all.").

accordance with Kosher standards." (Defs.' Br., at 23.)[3]  This is not only false, it creates myriad

fact issues that foreclose Defendants from obtaining summary judgment.

First, Defendants' assertion that "[a]ll foods purchased and used for Common Fare

(except fruits and vegetables) are consistent with or certified kosher by a recognized Orthodox

Standard, such as 'U', 'K' or 'CRC'" is directly contradicted by evidence produced by

Defendants and by the testimony of Defendants' own witnesses.  (*Id.*, at 22.)  Defendants

produced, and Mark Engelke, VADOC's Director of Food Services, appended to his declaration,

a photograph of a box of soy dinner mix purchased for River North that includes a kosher

certification from an organization called Ko Kosher of Philadelphia.  (Rappoport Decl. Ex. 19

(Bates #01496); Declaration of Mark Engelke ("Engelke Decl.") Ex. B.)[4]  But, as Rabbi Kranz

stated in his unrebutted expert report, this symbol is not acceptable under the Jewish dietary

laws.  (Kranz Decl. Ex. A ¶ 25.)  In fact, the "Ko" certification is not even included on the list of

kosher certification symbols supposedly recognized by VADOC for the common fare diet.

(Rappoport Decl. Ex. 20 (Bates #01828).)  Another photograph produced by Defendants, and

appended to Mr. Engelke's declaration, shows enriched farina purchased for use at River North

that lacks any kosher certification.  (Rappoport Decl. Ex. 18 (Bates #01476); Engelke Decl. Ex.

B.)  In addition, Jeffrey Janisko, the Quality Assurance Manager at the Virginia Distribution

Center ("VDC"), the warehouse that purchases and stocks the food used by VADOC facilities,

testified that he was not aware of any formal list of accepted kosher symbols, that he relied on a

list of symbols supposedly created by a predecessor, and that when verifying the kosher symbols

on that list, he would "look[] on the internet for images of kosher symbols" and did not consult a

---

[3] Mr. Estes respectfully refers the Court to his accompanying motion to strike and/or exclude Rabbi Schectman's untimely and unreliable declaration.

[4] Unless otherwise noted herein, the declaration cites in this brief refer to declarations filed in support of Mr. Estes' Motion for Summary Judgment, which apply with equal force here.

rabbi.  (Rappoport Decl. Ex. 21 (Transcript of the Deposition of Jeffrey Janisko, dated August 24, 2017, ("Janisko Dep."), 9:9-10:23).)  Thus, Defendants' own evidence contradicts their assertion that common fare food is kosher and, at a minimum, creates significant questions of fact as to whether the food purchased for the common fare menu is "consistent with or certified kosher by a recognized Orthodox Standard."  (Defs.' Br., at 22.)

Second, although Defendants claim that River North kitchen workers and staff "are properly handling Common Fare food, and they are not cross-contaminating Common Fare food, utensils, and trays when they deliver the meals" (Defs.' Br., at 22), the testimony of Defendants' own witnesses again shows otherwise.  Angela Debord, River North's assistant food director, testified that general-population and common fare meals are served on the same steam tables as the general-population food.  (Rappoport Decl. Ex. 5 (Debord Dep. 30:16-19).)  Ms. Debord also confirmed that the common fare ovens are located in the main kitchen area used for the preparation of general population food.  (*Id.* Ex. 5 (Debord Dep. 26:3-5).)  Jessica Morrsion, River North's Food Operations Director, also testified that the common fare kitchen was "not large enough for an oven," so the common fare oven is located "on the floor with the general population kitchen."  (*Id*. Ex. 7 (Morrison Dep. 32:8-13).)  Moreover, Ms. Morrison testified that the ovens currently used for the common fare menu at River North were previously used for general-population food and were not properly made kosher when they were re-designated for the common fare menu in 2014.  (*Id*. Morrison Dep. 56:20-57:12.)

Third, Defendants claim—without citation—that "offenders are trained on the Common Fare policy" (Defs.' Br., at 23), yet both Ms. Debord and Mr. Engelke have testified that inmates have not received any training on the laws of *Kashrut.*  (*Id.* Ex. 2 (Engelke Dep.) 47:3-5 ("does any of that [inmate] training involve Jewish dietary laws, for example?"  "No."); 47:15-18

("Does the inmate who's preparing the cooked farina on that Sunday morning receive any particular training about Jewish dietary laws?"  "No."); *Id.* Ex. 5 (Debord Dep. 32:11-14 ("The inmates who work in the Common Fare kitchen, has anyone provided them with training on kosher laws?"  "No.").)  River North's non-Jewish chaplain has also testified that he has never been trained on the laws of *Kashrut* and does nothing to ensure that the common fare food is kosher.  (*Id.* Ex. 10 (Transcript of Deposition of Reverend Bernard Morris, dated Jan. 12, 2017 ("Morris Dep.") 44:21-45:1 ("Have you ever taken an educational course on kosher laws?"  "No, sir."  "Did you receive any training from Virginia Department of Corrections on kosher laws?"  "No, sir."); 54:16-18 ("Do you do anything to ensure that Common Fare food is kosher?"  "No, sir.").)  Defendants therefore fail to establish the existence of any such training and create a question of fact as to whether *anyone* at River North is trained in the laws of *Kashrut.*

Fourth, while Defendants argue that "[n]o pork or pork derivatives are used in Common Fare food" and "[t]he Common Fare food is kept separate from the nonkosher food at all times" (Defs.' Br., at 22-23), as Rabbi Kranz explained in his unrebutted expert report—and as Defendants themselves admitted in their Answer to the Second Amended Complaint—the laws of *Kashrut* mandate more than just pork-free food and include, among many other things, directives on what food needs to be purchased; how food needs to be stored, prepared, cooked, and served (and these factors all vary by food type and temperature); and how to clean any items that come in contact with the food.  (Rappoport Decl. Ex. 1 (Second Amended Complaint ("SAC") ¶ 21); *Id.* Ex. 30 (Answer ¶ 21 ("Admit")); Kranz Decl. Ex. A ¶ 13.)  To be kosher, a food item must be derived from religiously acceptable sources, stored in kosher containers, prepared in a particular manner, and served on kosher tableware and with kosher utensils. (Rappoport Decl. Ex. 1 (SAC ¶ 21); Ex. 30 (Answer ¶ 21).)  In addition, meat and poultry may

not be mixed with dairy products.  (*Id.*)  Defendants fail to establish that all of these rules are followed at River North.  Nor is there any rabbi or person knowledgeable in the Jewish dietary laws supervising River North's common fare kitchen to ensure compliance with these rules (Kranz Decl. Ex. A ¶ 15), which as Rabbi Kranz testified, creates a "lack of assurance" that the food retains whatever "kosher compliance" it may have had.  (Defs' Br., at 10 (citing Kranz Dep. 22:1-16).)

Fifth, in support of their position that "offenders housed at RNCC are receiving food that is purchased, maintained, prepared, and served in accordance with Kosher standards" (Defs.' Br., at 23), Defendants contend that "during Rabbi Schectman's recent visit, he noted only two relatively minor suggestions for improvement."  (*Id.* at 23.)  But, unlike Rabbi Kranz, Defendants have not even established Rabbi Schectman's credentials as a rabbi, much less that he is an Orthodox rabbi.  In particular, Rabbi Schectman declares that he is "an ordained rabbi," but he does not say from where he received, or even if he received, his *smicha*, or rabbinic certification.  This is vital information because Mr. Estes is an Orthodox Jew, and the only opinion that matters with respect to whether the laws of *Kashrut* are being followed is the opinion of an Orthodox rabbi.  And, as explained in the accompanying motion to strike, Rabbi Schectman's declaration is unreliable given its cursory description of his inspection of River North, among other things.  For instance, Rabbi Schectman saw only one day's food service, not all common fare food service, and does not even claim to have witnessed the alleged breaking down and cleaning of the dishwasher, used for both general population and common fare utensils and plates, between meals.  The Court should therefore give Rabbi Schechtman's evaluation of River North no weight.  And, in any event, Rabbi Schectman is a mere fact witness, whose opinion on compliance with the laws of *Kashrut* is due no special consideration, even if

Defendants had actually established his *bona fides.*  Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, *or other specialized knowledge* within the scope of Rule 702.") (emphasis added).

Sixth, although Mr. Engelke now claims that the common fare program was "developed and implemented with the assistance of a Rabbi" (Engelke Decl. ¶ 4), he does not state whether that rabbi was Orthodox or of some other sect of Judaism.  This is significant because, as Rabbi Kranz testified in his deposition—unrebutted by Defendants—the person responsible for determining whether the laws of *Kashrut* are being followed must be "an orthodox Jew themselves."  (Rappoport 2nd Decl. Ex. B (Kranz Dep. 41:3-7).)  Further, Mr. Engelke's testimony is contradictory to his own deposition testimony that nobody Jewish was consulted when constructing the common fare kitchen area (Rappoport Decl. Ex. 2 (Engelke Dep.) 30:16-19), as well as his testimony that VADOC personnel who receive grievances concerning the common fare program are not required to check with "some rabbinic authority or religious authority or some chaplain to determine whether, in fact, th[e] grievance is correct."  (Rappoport 2nd Decl. Ex. C (Engelke Dep. 133:12-17).)  Further, Mr. Engelke testified that he consulted only the non-Jewish chaplain, who had no apparent knowledge of Passover requirements, and not a rabbi, when making modifications to the common fare and standard menus for Passover.  (*Id.* (Engelke Dep. 166:1-17).)  These facts not only call into question Mr. Engelke's credibility, they demonstrate the slipshod manner in which Defendants attempt to ensure that the common fare menu follows the laws of kosher.  And, of course, Mr. Engelke's testimony creates an issue of fact concerning whether a rabbi was consulted about the common fare program and the extent

- 10 -

to which that rabbi's advice is followed.

Finally, Defendants resort to questioning Mr. Estes' honestly held religious beliefs by claiming that "Estes has made voluntary purchases at the commissary that do not consistently follow his kosher dietary requirements."  (Defs.' Br., at 25.)  But Defendants fail to establish that Mr. Estes actually consumed any of the allegedly unkosher products he purchased in the commissary.  (*See* Declaration of R. Sturgill ¶¶ 6-7.)  Defendants' citation to *Tuller v. Braxton,* No. 7:02-CV-01297, 2004 U.S. Dist. LEXIS 30652 (W.D. Va. Sept. 17, 2004), wherein the plaintiff *admitted* to eating nonkosher food, is therefore inapposite.  Moreover, even if Mr. Estes had eaten unkosher food in isolated instances, that is only one factor of many that the Court may consider.  (Defs.' Br., at 25.).  In any event, it is undisputed that Mr. Estes was given and passed a religious sincerity test, which is how he was permitted to receive the common fare menu in the first place (Estes Decl. ¶ 10), and that he provided VADOC with a Jewish Burial Declaration in November 2015.  (Declaration of B. Kanode ¶ 5; Ex. A.)  Mr. Estes has also testified that his religious beliefs mandate that he eat kosher food.  (Estes Decl. ¶ 5.)  Thus, the sincerity of Mr. Estes' Jewish faith is not seriously in dispute, and Defendants have created another dispute of fact that makes summary judgment inappropriate.[5]

---

[5] Defendants mistakenly argue this case is similar to *Hayes v. Bruno*, 171 F. Supp. 3d 22 (D. Conn. 2016).  (Defs.' Br., at 23.)  In *Hayes*, the *pro se* plaintiff provided no expert testimony and, indeed, "fail[ed] to provide *any* admissible evidence showing that the Common Fare meals are not prepared in accordance with Jewish law."  *Hayes*, 171 F. Supp. 3d at 31 (emphasis added).  The outcome of the case hinged on the fact that the plaintiff "provide[d] no affidavit from a rabbi certifying that the process used is not kosher," "relie[d] heavily on his [own] interpretation of excerpts from the Torah," and "ha[d] no personal knowledge of the preparation, storage and serving processes."  *Id.* at 31.  Here, by contrast, the evidence supporting Mr. Estes' claims, including expert testimony, is robust, and Mr. Estes' factual assertions are supported by an expert witness.  Defendants, on the other hand, have offered no expert testimony—aside from the untimely and inadmissible filing of Rabbi Schectman's Declaration—in support of their motion.

- 11 -

### B.     Defendants' Other Restrictions Also Substantially Burden Mr. Estes.

With respect to other religious practices, such as observing fast days and blowing the

Shofar on the Jewish high holidays, a substantial burden exists "when a state or local

government, through act or omission, 'put[s] substantial pressure on an adherent to modify his

behavior and to violate his beliefs.'"   *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

### 1.     Shofar

Defendants do not dispute that hearing the blasts of the Shofar for Rosh Hashanah and

Yom Kippur "is important."  (Defs.' Br., at 36.)  Instead, Defendants claim that they have

mooted Mr. Estes' claim by agreeing to "allow offenders to listen to a recording of the blowing

of a Shofar."  (*Id.*)  But, as Rabbi Kranz explained in his unrebutted expert report, "Jewish

law . . . *mandates the blowing of a Shofar during prayer services on the high holidays*" (Kranz

Decl. Ex. A ¶ 30 (emphasis added)), meaning the Shofar must actually be blown during the

services.  A recording of a previously blown Shofar is therefore insufficient.  Further, while

Defendants contend that the Shofar poses a safety risk (Defs' Br., at 36-37), they ignore that in

the March 24, 2016, minutes of the Faith Review Committee meeting, one warden had suggested

that the Shofar could be approved for use because it was "similar in appearance to the 10-1/2"

Ceremonial Native American pipe that is already approved for use" and "would be stored in the

chaplain's office when not in use."  (Rappoport Decl. Ex. 28 (Bates # 0691).)  Defendants also

ignore that Reverend Morris has testified that another prison, Sussex II, still permits a Shofar to

be present on the grounds.  (*Id.* Ex. 10 (Morris Dep. 77:4-6).)  Thus, even assuming *arguendo*

that the Shofar is a legitimate security risk, VADOC offers no reason why the Shofar could not

be securely stored and brought out in a controlled setting for use during services on the holiest

days of the Jewish calendar.  Defendants therefore fail to establish an entitlement to summary

judgment, as issues of fact exist as to whether Mr. Estes' religious exercise has been substantially burdened with respect to the blowing of the Shofar.

## 2.     Fast Days

Mr. Estes alleges that Defendants' failure to recognize three significant Jewish fast days— *Asara b'Tevet* (commemorating the siege of Jerusalem by Nebuchadnezzar II of Babylonia that ultimately culminated in the destruction of Solomon's Temple (the First Temple)), *Shivah Asar B'Tammuz* (commemorating the first breach in the walls of Jerusalem before the First Temple was destroyed), and *Tisha b'Av* (a day of mourning to commemorate the many tragedies that have befallen the Jewish people, including the destruction of the First Temple)— substantially burdens his religious exercise.  (Estes Decl. ¶ 20-21.)  Mr. Estes also alleges, and Defendants do not dispute, that because Defendants do not accommodate these fast days, he "is required to extend his fast until the next morning, which 'results in hunger and pain for Estes.'" (Defs.' Br., at 37 (quoting SAC ¶ 57).)  But Defendants deny that their refusal to recognize these fast days substantially burdens Mr. Estes' religious exercise because Mr. Estes "is never forced or required to eat the contents of the tray" he is required to take and "could simply take his three Common Fare trays and throw them away" without losing his ability to receive common fare meals.  (Defs.' Br., at 37-38.)

This in no way answers Mr. Estes' core complaint, which is that by failing to recognize the fast days, Defendants provide no way for him to break his fast, which then leads to hunger and pain.  (Rappoport Decl. Ex. 1 (SAC ¶ 57).)  Defendants posit that Mr. Estes can "eat items he has in his cell that were purchased from the commissary in order to accommodate his hunger," which they acknowledge would be "an inconvenience" (Defs.' Br., at 38), but they make no provision for the possibility that Mr. Estes might not be able to afford to purchase food from the commissary, nor do they consider Mr. Estes' nutritional needs.  Thus, even if Mr. Estes

will not be penalized for fasting on the requested day, his religious exercise is still substantially burdened by the fact that Defendants' refuse to allow him to break the fasts, despite the fact that VADOC officials have acknowledged that Mr. Estes could easily be accommodated by opening the River North cafeteria slightly earlier and keeping it open slightly later on Jewish fast days, which River North already does for the entire month of Ramadan.  (Rappoport Decl. Ex. 2 (Engelke Dep. 202:1-203:4).)

## II.    DEFENDANTS FAIL TO SHOW A COMPELLING GOVERNMENT INTEREST.

Defendants contend that they are entitled to summary judgment because, even if the common fare diet does not meet Orthodox Jewish kosher standards—and it does not, and therefore substantially burdens Mr. Estes' religious exercise—it serves a compelling government interest by "allow[ing] VDOC to reduce costs and promote efficiency."  (Defs.' Br., at 26.)  But Defendants fail to show that purchasing prepackaged kosher meals, or hiring rabbinic supervision for the common fare kitchen, would be so significant a financial burden to justify Defendants' actions under the requisite strict scrutiny analysis.  And while Defendants now claim that there are "significant . . . operational, and administrative hurdles preclud[ing] adoption of Plaintiff's requested prepackaged kosher meals" (Defs.' Br., at 28), Defendants' witnesses' testimony reflects that Defendants provided prepackaged entrees to inmates prior to 2007 and ceased doing so *only* because of the alleged cost, not some imagined "operational" or "administrative" hurdle.  (Rappoport Decl. Ex. 2 (Engelke Dep. 90:4-15; 93:19-94:4) (discontinuing prepackaged kosher entrees was "*[s]olely* a cost item." (emphasis added).)

### A.    Defendants Fail to Establish that Cost Is a Compelling Government Interest Sufficient to Deny Mr. Estes Kosher Food.

VADOC's interest in saving money by not providing kosher meals is not a compelling government interest.  The Supreme Court has been clear that "compelling governmental

interests" are those "of the highest order" implicating public health, safety, or welfare.

*Wisconsin v. Yoder*, 406 U.S. 205, 215, 230 (1972).[6]  "Saving a few dollars is not a compelling

interest, nor is a bureaucratic desire to follow the prison system's rules."  *Schlemm v. Wall*, 784

F.3d 362, 365 (7th Cir. 2015).  "RLUIPA may require a government to incur expenses in its own

operations to avoid imposing a substantial burden on religious exercise."  *Garner v. Kennedy*,

713 F.3d 237, 245 (5th Cir. 2013) (quoting RLUIPA Rules of Construction, 42 U.S.C. § 2000cc-

3(c)) (quotation marks omitted).

      Even if costs could rise to a level implicating health, safety, or welfare, Defendants do no

more than "simply utter the magic word costs," which is insufficient to demonstrate a compelling

government interest.  *Sec'y, Fla. Dep't of Corr.*, 828 F.3d at 1348 (internal citations omitted).[7]

Defendants must—but cannot—show exactly why the particular costs VADOC would expend to

provide Mr. Estes with kosher food create a compelling government interest.  *See, e.g.*, *Schlemm*,

784 F.3d at 365 (allowing prisoner's case to proceed where government "has not tried to estimate

what it would cost to honor Schlemm's request; expense may be negligible if he finds a vendor

to provide a sealed platter of food acceptable"); *Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir.

---

[6] Courts have found government interests "compelling" where the government could demonstrate serious health, security, or disciplinary concerns.  *See, e.g.*, *Holt v. Hobbs*, 135 S.Ct. 853, 863-65 (2015) (finding that the Arkansas Department of Corrections showed compelling interests in "staunching the flow of contraband" and in inmate identification, but that a half-inch-beard policy was not the least restrictive means of furthering those interests); *Knight v. Thompson*, 797 F.3d 934, 944-45 (11th Cir. 2015) (finding a compelling government interest in "security, discipline, hygiene, and safety" where the Alabama Corrections Department's short-hair policy prevented inmates from concealing weapons, contraband, and contagious health conditions under long hair, and emphasizing the government's showing of specific incidents in the record); *Ali v. Stephens*, 822 F.3d 776, 787 (5th Cir. 2016) (finding a compelling government interest in preventing contraband but concluding that the Texas Corrections Department's four-inch-beard policy did not further that interest).

[7] "In determining whether a cost is compelling, a court may need to put the amount in perspective by measuring the projected expense against the resources devoted to that interest."  *Ali*, 822 F.3d at 792 (citation omitted).  *See also Moussazadeh*, 703 F.3d at 794-95 (rejecting cost-saving as a compelling interest where the estimated cost saved denying an inmate kosher food was less than 0.05% of the Texas Corrections Department's total food budget, though "declin[ing] to draw a bright-line rule").

- 15 -

2008) ("The prison officials failed to show what effort would have been involved in providing a meatless diet to Koger, how this would have hampered prison administration, or how the clergy verification furthered any interest not already satisfied by Koger's submissions."); *Hall v. Klemm*, No. 15-20 E, 2017 WL 913954, at *13 (W.D. Pa. Feb. 1, 2017), *report and recommendation adopted*, No. 15-20, 2017 WL 913803 (W.D. Pa. Mar. 7, 2017) ("[Defendants'] stated interest in simplifying food services cannot be considered compelling, given the lack of any evidence to suggest that Plaintiff's dietary request has placed a particularly onerous burden on the institution.").

Instead, Defendants assert that providing prepackaged entrees to VADOC's inmates, as it did until 2007 (*see* Engelke Decl. ¶ 10), would be "too costly." (Defs.' Br., at 12.) Defendants suggest that prepackaged kosher meals could cost between $6.19 and $8.50 per inmate per day, based on meals provided to Islamic inmates at another prison and the Federal Bureau of Prisons' prepackaged meal plan (*id.* at 11; Engelke Decl. ¶¶ 10-11), as opposed to the current food budget of $2.10 "for each offender" per day (Engelke Decl. ¶ 10). But Defendants do not state whether the meals served to the Islamic inmates or the prepackaged food served by the Federal Bureau of Prisons is comparable to the prepackaged kosher meals sought by Mr. Estes. Further, Defendants do not state whether the $2.10 number reflects the cost for inmates currently on the common fare program, for all inmates combined, or for just main population inmates. It is therefore entirely unclear—and perhaps intentionally so—what the actual cost differential may be between prepackaged kosher entrees and common fare meals. Defendants also do not provide any information concerning the number of inmates that might eat such meals if they were offered, nor do they estimate how much more it might cost, relative to VADOC's food budget, to feed those inmates kosher food. Rather, Defendants assert that there are "3,000 offenders

utilizing the Common Fare diet at this time" (*id.*), even though this says nothing about how many of those inmates would be entitled to kosher food, let alone how many might actually opt for such food.  Defendants have therefore failed to establish *any* cost burden associated with offering prepackaged kosher entrees.

Indeed, the record reflects Defendants never even bothered to ascertain the cost of providing Mr. Estes with kosher food.  (Rappoport Decl. Ex. 2 (Engelke Dep. 92:14-17 ("Did you ever look into the feasibility of just providing the kosher entrée to Jewish inmates who asked for a kosher entrée?"  "No."); 102:8-13 ("So do you know how many of those [inmates on the common fare menu] would actually want a kosher meal?"  "No."  "And you've done nothing to ascertain whether they would or would not; is that right?"  "No."); 29:10-13 ("Do you know how many Jews have asked for kosher food generally in the Virginia prison system?"  "No.")); *Id.* Ex. 3 (Perdue Dep. 57:4-6 ("Do you know how much it would cost now to provide those [prepackaged] meals to inmates at River North?"  "No.")); *Id.* Ex. 5 (Debord Dep. 42:4-7 ("Have you looked into how many River North inmates would request Orthodox kosher meals if available?"  "No.")); *Id.* Ex. 21 (Janisko Dep. 19:8-12, 18-19 ("So if a prison said we want to get a stack of prepackaged meal for kosher dinners, that's something that you could go out into the market and get vendors for?"  "Yes." "And you have never been asked to do that?"  "No.")).)  Defendants simply provide the vague and conclusory assessment that they "would incur extensive administrative costs," which is wholly insufficient to carry their burden for summary judgment.  *Garner*, 713 F.3d at 246 (rejecting a costs-based argument where the government "presented testimony only that its costs would increase," without "attempt[ing] to approximate the amount of those costs" or "present[ing] any concrete evidence concerning how other operations of the prison system would be affected by these increased costs").

That VADOC was able to provide prepackaged entrees in the past demonstrates that there is no compelling government interest in failing to provide them now.  *See, e.g.*, *Moussazadeh*, 703 F.3d at 794-95 ("TDCJ's argument that it has a compelling interest in minimizing costs by denying Moussazadeh kosher food, however, is dampened by the fact that it has been offering kosher meals to prisoners for more than two years"); *Ali*, 822 F.3d at 793-94 ("TDCJ's current grooming policy allows inmates to grow a half-inch beard for religious reasons.  Therefore, TDCJ … has not shown it will bear a significantly greater burden in this respect by permitting an inmate to grow a beard that is three-and-one-half-inches longer than is currently permitted").  And, in fact, VADOC's own employees testified that they would be able to source such meals if asked.  (Rappoport Decl. Ex. 21 (Janisko Dep. 19:8-12).)

Defendants also assert, without support, that to hire a rabbi to supervise the common fare kitchen for all 17 prisons would cost "approximately $1,711,050."  (Defs.' Br., at 32.)  But Defendants fail to put this number in any context or explain whether they investigated cheaper alternatives to hiring rabbis full-time for each prison.  Defendants also speculate that "there are also small populations around many of the VDOC institutions, which would make it nearly impossible to hire a rabbinical authority at each institution" (*id.*), but they set forth no *facts* establishing the truth of this speculation, much less showing that they even tried to locate rabbinic authorities in those locations.  *See Evans v. Techs. Applications. & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory."); *Maldonado v. Ramirez*, 757 F.2d at 48 (3rd Cir. 1985) ("An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the [burden in a motion for summary judgment].").

Finally, and fatally, every case Defendants cite to argue that the supposed cost of

providing prepackaged kosher entrees is a "compelling government interest" applies the lower standard of "legitimate government interest" and, thus, does not apply here.  This distinction is critical because RLUIPA claims, by requiring a "compelling government interest," are subject to strict scrutiny that requires narrow tailoring of regulations, whereas the "legitimate government interest" standard applies to lesser, and thus inapplicable, rational basis scrutiny.  *See Smith v. Perlman*, 658 F. App'x 606, 608 n.3 (2d Cir. 2016) (noting that the "stricter" compelling government interest test of "RLUIPA stands in contrast to the Free Exercise Clause's rational-relationship test"); *Wilson v. McPeak*, No. 7:15-cv-00175, 2016 WL 676584, at *4 (W.D. Va. Feb. 18, 2016) ("The primary difference between RLUIPA and the First Amendment […] is that RLUIPA adopts a strict scrutiny standard of review, instead of the reasonableness standard under the First Amendment.").  Indeed, the Fourth Circuit, in *Lovelace*, denied summary judgment to certain defendants on an RLUIPA claim where defendants "assert[ed] simply a 'legitimate interest in removing inmates from religious dietary programs,'" but did "not elaborate how this articulated 'legitimate interest' qualifies as compelling."  472 F.3d at 190.

   *Cooper v. Lanham*, No. 97-7183, 1998 WL 230913 (4th Cir. May 7, 1998), an unreported *per curiam* Fourth Circuit opinion that pre-dates RLUIPA and that analyzed whether a regulation passes muster under the First Amendment, is one of the many inapposite cases on which Defendants rely to argue that costs and administration are compelling government interests. *Cooper* applied a four-prong standard that asks whether the government action was "reasonably related" to a legitimate government interest, not whether it was "in furtherance of a compelling government interest."  *Id.* at *1.  As the Fourth Circuit has since recognized, "the First Amendment affords less protection to inmates' free exercise rights than does RLUIPA."

*Lovelace*, 472 F.3d at 199-200.[8]  *Cooper*, therefore, is of no help to Defendants here.

The string of cases Defendants cite concerning "legitimate penological interests of containing costs, managing scarce prison resources, and efficient food provision" likewise apply the less stringent "legitimate interest" standard for equal protection and First Amendment claims, not RLUIPA's "compelling" interest standard, and are therefore entirely inapposite.  (*See* Defs' Br., at 27-28 (citing *Baines v. Hicks*, No. 3:14CV616, 2016 WL 7380558, at *16 (E.D. Va. Dec. 19, 2016) (applying legitimate penological interest standard to Fourteenth Amended Equal Protection claim); *DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004) (same, and, in fact, allowing RLUIPA claim to proceed); *Williams v. Morton*, 343 F.3d 212, 217-18 (3d Cir. 2003) (applying legitimate penological interest standard to First Amendment claim).)

Likewise, in *Muhammad v. Mathena*, No. 7:14-CV-00134, 2015 WL 300363, at *3 (W.D. Va. Jan. 22, 2015), another of Defendants' cited cases, the court granted summary judgment because the "uncontroverted record reflect[ed] that Common Fare substantially accommodates Plaintiff's religious dietary needs," noting that the "cost-efficient, uniform" program served a "legitimate" state interest, but not a *compelling* one.  Further, unlike in *Muhammad*, the unrebutted testimony of Rabbi Kranz, an Orthodox rabbi, establishes that Defendants here *do not* provide Mr. Estes with kosher food, which substantially burdens his exercise of his religion by leaving him "the choice of violating a religious tenet or going without food."  *Al-Amin*, 325 F. App'x at 194-95.

Similarly, in *DePaola v. Va. Dep't of Corr.*, No. 7:12-CV-00592, 2014 WL 3956108, at *4 (W.D. Va., Aug. 12, 2014), the court again found cost to be only a "legitimate" government interest, not a compelling one, and, in any event, based its ruling not on cost, but on the concern

---

[8] Moreover, it appears that the evidence concerning cost provided in *Cooper* was more substantial and contextualized than that put forward by Defendants here.

that "allowing ad hoc adjustments to the master menu at each institution would create a potential for inconsistent interpretations and accommodations of inmates' religious dietary needs" and "would lead to requests for similar exceptions for inmates of other NOI and Muslim sects and lead to exponential increases in cost and operational complications."  But here, Mr. Estes does not seek ad hoc adjustments to the common fare menu, only that he be provided "nutritionally sufficient kosher meals."  (Rappoport Decl. Ex. 1 (SAC, at 14).)  Indeed, Defendants have not provided any evidence that allowing Orthodox Jews such as Mr. Estes to receive prepackaged kosher meals will create a sudden surge in such requests by other inmates, nor have Defendants suggested any reason why the provision of prepackaged kosher meals cannot be limited only to the small Orthodox Jewish community.

At bottom, case law is quite clear that cost is almost never a compelling government interest and, where it is, more is required than just suggesting that Mr. Estes' prepackaged kosher alternative is more expensive than the cost of common fare meals.  For all of the reasons set forth above, Defendants apply the wrong legal standard and fail to make the necessary evidentiary showing to prevail on this issue at summary judgment.

### B. Defendants' New Claims of Administrative Burden Fail to Establish a Compelling Government Interest.

Mr. Engelke testified that the service of prepackaged entrees was discontinued "solely" due to "cost."  (Rappoport Decl. Ex. 2 (Engelke Dep. 90:4-15; 93:19-94:4).)  Similarly, Carroll Perdue, VADOC's Regional Food Operations Director for the Western Region (which includes River North), testified that, other than cost, he did not have any concerns about providing prepackaged kosher meals at River North, and Jessica Morrison, Food Operations Director at River North, testified that she was concerned about cost and generally about equality for all offenders.  (Rappoport Decl. Ex. 3 (Perdue Dep. 61:23-62:6; 66:23-67:1); *Id*. Ex. 7 (Morrison

Dep. 60:4-10).)  Now, suddenly, Defendants claim that their inability to provide kosher food is

due to both cost *and* "operational, and administrative hurdles preclude adoption of Plaintiff's

requested prepackaged kosher meals."  (Defs.' Br, at 28.)  Even if this were true—and

Defendants again present no specific facts showing that it is, as required on a motion for

summary judgment—Defendants' previous testimony creates an issue of fact as to whether there

actually are "operational" and "administrative" concerns that prevent Defendants from providing

Mr. Estes kosher food.

### C.     Defendants Have Proffered No Compelling Government Interest to Satisfy VADOC's Other Restrictions on Religious Exercise.

Defendants have not put forward any compelling government interest for VADOC's

other religious restrictions.

*Fast Days*:  Defendants do not actually argue that any compelling government interest is

served by refusing to recognize three Jewish fast days.  (*See* Defs' Br., at 37-38.)  To the extent

their motion papers allow for a possible compelling interest to be divined, it may be that

allowing Jewish inmates to break their fasts might require Defendants "to schedule longer dining

hall times . . . and longer work hours for staff and inmate workers."  (*See id.* Defs' Br., at 12.)

But Mr. Engelke has admitted that "[we] can do it" when asked whether it would be "difficult" to

"serve certain meals later after sundown."  (Rappoport Decl. Ex. 2 (Engelke Dep. 187:16-19).)

Indeed, Mr. Engelke agreed that if Mr. Estes was permitted to request his meal to be taken at six

p.m. instead of four p.m., such a requested was "doable."  (*Id.* (Engelke Dep. 187:20-188:6).)

Further, when asked whether, for example, VADOC could serve meals after sunset eight days a

year instead of five, Mr. Engelke responded "[y]es."  (*Id.* (Engelke Dep. 188:17-21).)  Jessica

Morrison also testified that it would not be logistically difficult to add fast days.  (*Id.* Ex. 7

(Morrison Dep. 82:6-15).)  Defendants' failure to establish a compelling government interest in

denying fast days necessarily precludes summary judgment.

*Blowing the Shofar*:  Defendants contend that the blowing of the Shofar is properly prohibited because it "could be used as a weapon."  (Defs.' Br., at 36.)  But, as shown above, at least one warden had suggested that the Shofar could be approved for use because it was "similar in appearance to the 10-1/2" Ceremonial Native American pipe that is already approved for use" and "would be stored in the chaplain's office when not in use."  (*Id.* Ex. 28 (Bates # 0691).)  Even assuming *arguendo* the Shofar were a legitimate security risk, VADOC offers no reason why the Shofar could not be securely stored and brought out in a controlled setting for use during services on the three holiest days of the Jewish calendar.

## III.   DEFENDANTS FAIL TO ESTABLISH THAT THEY USE THE LEAST RESTRICTIVE MEANS.

To satisfy the "least restrictive means" requirement, Defendants must establish that "no alternative forms of regulation" would further the governmental interest.  *Sherbert v. Verner*, 374 U.S. 398, 407 (1963).  "[I]f a less restrictive means is available for . . . [g]overnment to achieve its goals, . . . [g]overnment must use [that means]."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000).  "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party."  *Holt*, 135 S. Ct. at 864 (citation omitted) (quotation marks omitted).

### 1.   Prepackaged Kosher Meals Are a Cost-Effective and Reasonable Accommodation for Estes' Dietary Requirements.

Defendants assert that the common fare menu is the least restrictive means of advancing their purported compelling interests of cost and administrative and operational burden.  (Defs.' Br., at 32-33.)  But even if Defendants could show a compelling government interest as to cost containment (and they cannot), they do not establish that their utter failure and refusal to provide

- 23 -

kosher meals to Mr. Estes is the least restrictive means of achieving that goal.  (Rappoport Decl. Ex. 5 (Debord Dep. 55:7-10) ("Are you aware of any reason why prepackaged kosher meals can't be served to Orthodox [Jewish] inmates at River North?"  "No.").)  VADOC offers three different meal options already and previously offered prepackaged kosher entrees to inmates as late as 2007.  (Rappoport Decl. Ex. 1 (SAC ¶¶ 25-26); *Id*. Ex. 30 (Answer ¶¶ 25-26 ("Admit."));  Estes Decl. ¶¶ 6-7.)  At a minimum, Defendants have created an issue of fact as to whether there are less restrictive alternatives to the common fare plan that would satisfy Defendants' compelling government interests.

Defendants fail to show that they even considered another less restrictive alternative, beyond providing two cost estimates for prepackaged kosher entrees; their assertion that serving unkosher food, even to the tiny Jewish population of the River North community, is less restrictive than offering prepackaged kosher meals therefore rings hollow.  *See, e.g.*, *Sec'y, Fla. Dep't of Corr.*, 828 F.3d at 1349 ("[T]he Secretary fails to explain why the Department cannot offer kosher meals when it offers vegan, medical, and therapeutic diets at similar marginal costs."); *Lebaron v. O'Brien*, No. 15-00275, 2016 WL 5415484, at *13 (Mass. Super. Ct. June 15, 2016) ("Director Gendreau's affidavit merely explains why provision of the Holy Diet would be burdensome; it does not constitute evidence of the prison's consideration and reasoned rejection of other means of satisfying the plaintiffs' dietary requests."); *Toler v. Leopold*, No. 2:05-CV-82 JCH, 2008 WL 926533, at *3 (E.D. Mo. Apr. 3, 2008) ("[T]he Court finds Defendants' speculations regarding the increased risk associated with providing Kosher food to be undermined by the undisputed fact that Defendants have provided numerous alternative menus for medical reasons without incident or impact.").

Other courts have found the existence of a prepackaged alternative to be evidence that the

denial of a religious diet is a violation of the RLUIPA.  *See, e.g.*, *Jones v. Comm'r, Ind. Dep't of Corr.*, No. 1:16-cv-2887-WTL-MJD, 2017 WL 3398002, at *3 (S.D. Ind. Aug. 8, 2017) ("[T]he provision of the pre-packaged kosher meal tray already available at those facilities without kosher kitchens will be minimally burdensome to the Defendant"); *Muhammad v. Wheeler*, 171 F. Supp. 3d 847, 857 (E.D. Ark. 2016) ("if [plaintiff] claims that offering a pescatarian meal plan would no longer place a substantial burden upon his religious exercise, [defendants] must show how refusing to provide such a plan furthers a compelling government interest and is the least restrictive means of doing so."); *Shilling v. Crawford*, 536 F. Supp. 2d 1227, 1234 (D. Nev. 2008) ("Defendants have offered no evidence they considered alternatives to a transfer, such as providing pre-packaged or frozen kosher meals."); *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 411 (D. Mass. 2008) (granting judgment for prisoner plaintiff where "As with Kosher foods, there are available vendors willing and able to provide prepackaged Halal-certified meals in quantities sufficient to serve the 50 to 90 Muslim inmates at MCI–CJ that Acting Superintendent Marshall estimated might request such meals.").  This Court should do the same.

### 2.   Defendants Fail to Establish That VADOC Uses the Least Restrictive Means as to Its Other Religious Restrictions.

The record also shows that Defendants have less restrictive means of achieving their objectives with respect to VADOC's other religious restrictions.

*Fast Days*:  Defendants suggest the least restrictive alternative to Mr. Estes being allowed to observe three Jewish fast days is for him not to eat his common fare food and, instead, break his fast on food from the commissary.  (Defs.' Br., at 37-38.)  But Mr. Engelke has admitted that "[w]e can do it" when asked whether it would be "difficult" to "serve meals later after sundown" to allow Mr. Estes to break his fast.  (Rappoport Decl. Ex. 2 (Engelke Dep. 187:16-19).)  Further, when asked whether, for example, VADOC could serve meals after sunset eight days a year

instead of five, Mr. Engelke responded "[y]es." (*Id.* (Engelke Dep. 188:17-21).)  Jessica

Morrison also testified that it would not be logistically difficult to add fast days. (*Id.* Ex. 7

(Morrison Dep. 82:6-15).)  Defendants' purported suggestion is therefore not the least restrictive

means and, at a minimum, creates an issue of fact precluding summary judgment.

　　　　*Blowing the Shofar*:  Defendants appear to suggest that the least restrictive means of

providing for the Shofar to be blown on Rosh Hashanah and Yom Kippur is to play recorded

blasts of the horn.  (Defs.' Br., at 36.)  But, as shown above, this proposed solution does not

comply with Jewish law, which requires the blasts to be made during the ceremony, not at some

other time and then replayed.  Because it is important that adherents of Judaism hear the Shofar

blasts, rather than blowing the Shofar itself (Rappoport Decl. Ex. 29 (Kranz Dep. 13:13-15)), if

Defendants are worried about placing the Shofar in the hands of an inmate, they could arrange

for someone well-versed in the laws and art of blowing the Shofar to visit the prison on Rosh

Hashanah and Yom Kippur to perform the blasts.  As a less restrictive alternative that also

complies with Jewish law, this is a better solution to the one proposed by Defendants and, in any

event, it creates an issue of fact as to whether Defendants' recorded Shofar blasts are the least

restrictive means, thereby precluding summary judgment.

## IV.　DEFENDANTS' EFFORT TO LIMIT DAMAGES AND LIABILITY FAILS.

　　　　Defendants raise several arguments in an effort to limit the availability of damages and

the potential liability of Defendants.  Defendants' arguments lack merit and can be dispensed

with briefly.

　　　　*Availability of Damages under RLUIPA.*  Defendants argue that under RLUIPA,

Mr. Estes may not seek damages against Defendants in their official or individual capacities.

(Defs.' Br., at 17.)  Setting aside its legal merits, Defendants' argument is beside the point here

since Mr. Estes does not seek damages in his Second Amended Complaint.  Instead, he seeks

declaratory and injunctive relief, as well as costs and attorney's fees arising out of this litigation and "such other relief as the interest of justice may require," *none* of which Defendants argue is improper under RLUIPA or Virginia RFRA.

*Virginia RFRA Claim.*  Defendants argue that Virginia RFRA, which states that "[n]o government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability," carves out claims against VADOC because VADOC is excluded from the definition of "government entity."  (Defs.' Br., at 18.)  But Virginia RFRA still applies to those acting on behalf of VADOC, as "government entity," including "any official or other person acting under color of state law."  VA. CODE ANN. § 57-2.02.  Thus, even if Virginia RFRA does not apply to VADOC, it still applies to the individual Defendants, and therefore summary dismissal of Mr. Estes' entire Virginia RFRA claim would be improper.  And, of course, even if the Virginia RFRA claim were dismissed against VADOC, the RLUIPA claim would remain.

*Ponton, Walrath, B. Hall, and J. King.*  Defendants Ponton, Walrath, Hall, and King argue that they should be dismissed because "Plaintiff fails to allege how they are personally involved in any alleged RLUIPA violation."  (Defs' Br., at 19.)  But the Second Amended Complaint explains that Ponton is the Western Regional Director of Corrections in the Commonwealth of Virginia, Walrath is the warden of River North, King is the Operations Manager at River North and Hall is the Institutional Programs Manager of River North, (Rappoport Decl. Ex. 1 (SAC ¶¶ 13-16))—in other words, personnel responsible for shaping and implementing VADOC policy, including the decision not to offer kosher food to Orthodox Jews, to deny use of the Shofar, and to refuse to honor certain Jewish fast days.  Such decisions were intentional, not negligent, and therefore support individual liability under RLUIPA.  *See*

- 27 -

*Lovelace*, 472 F.3d at 194 ("RLUIPA at least reaches intentional conduct because that is what the Free Exercise Clause reaches.").

## V.      MR. ESTES' CLAIMS RELATING TO PRAYER AND STUDY

Mr. Estes hereby withdraws his RLUIPA and Virginia RFRA claims as they pertain to Defendants' alleged failure to permit Mr. Estes to pray or study with other Orthodox Jews.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Bruce Estes respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

Dated:  September 29, 2017                Respectfully submitted,

By: /s/ Cynthia Akatugba

    Cynthia Akatugba
    (Virginia Bar No. 88967)
    MORRISON & FOERSTER LLP
    1650 Tysons Boulevard
    Suite 400
    McLean, VA 22102
    Telephone:  703.760.7700
    Facsimile:   703.760.7777
    E-mail:      cakatugba@mofo.com

    Joel C. Haims (admitted *pro hac vice*)
    Steven T. Rappoport (admitted *pro hac vice*)
    MORRISON & FOERSTER LLP
    250 West 55th Street
    New York, NY 10019-9601
    Telephone:  212.468.8000
    Facsimile:   212.468.7900
    E-mail:      jhaims@mofo.com
             srappoport@mofo.com

    *Attorneys for Plaintiff Bruce A. Estes*

### CERTIFICATE OF SERVICE

I, Cynthia Akatugba, hereby certify that on September 29, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to Richard Carson Vorhis, counsel of record for defendants.

/s/ Cynthia Akatugba
Cynthia Akatugba
(Virginia Bar No. 88967)
MORRISON & FOERSTER LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102
Telephone:  703.760.7700
Facsimile:   703.760.7777
E-mail:        cakatugba@mofo.com

*Attorneys for Plaintiff Bruce A. Estes*