IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BRUCE A. ESTES, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:15cv00155 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| HAROLD W. CLARKE, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Bruce A. Estes, a Virginia inmate proceeding with counsel, filed a civil action pursuant to

42 U.S.C. § 1983, alleging that the defendants violated his rights under the Religious Land Use

and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, *et seq.*, and the Virginia

Religious Freedom Restoration Act (Virginia RFRA), Virginia Code § 57-2.02.[1]  (Dkt. No. 73.)

The parties filed cross-motions for summary judgment, and this matter ripe for disposition.[2]

(Dkt. Nos. 120, 124.)  For the reasons stated herein, the court will grant in part and will deny in

part each of the motions for summary judgment.

---

[1]  The court notes that Estes voluntarily dismissed his claims against Harold W. Clarke.  (*See* Dkt. No. 149.)  Further, the court will grant Estes's requests to voluntarily dismiss his claims against John Walrath, the former Warden of River North Correctional Center (River North), and Jessica King, the former Operations Manager of River North, as well as his claims that the defendants violated his rights under RLUIPA by prohibiting him from participating in Jewish prayer services and study sessions.  (*See* Resp. Opp'n. Summ. J. 33, Dkt. No. 127; Tr. Oral Arg. at 40:21–25, 42:17–23, Dkt. No. 147); Fed. R. Civ. P. 41(a).

[2]  Estes also filed a motion to strike the declaration of Rabbi Robert Schectman, which was filed in support of defendants' motion for summary judgment.  That declaration was untimely if Rabbi Schectman is considered to be an expert.  However, defendants assert that Rabbi Schectman is being offered only as a fact witness.  Accordingly, the court will deny Estes's motion to strike (Dkt. No. 129) and will not treat Rabbi Schectman's testimony as expert witness testimony.  Moreover, Rabbi Schectman's declaration was filed only in support of defendants' motion for summary judgment, so it will not be considered for purposes of adjudicating plaintiff's motion.

## I.  BACKGROUND

In his unverified second amended complaint,[3] Estes, who is Jewish, alleges that River

North Correctional Center (River North), where he is currently incarcerated, and the Virginia

Department of Corrections (VDOC) substantially burden his religious exercise by failing to

provide him with kosher meals, prohibiting the blowing of the Shofar[4] on the high holidays of

Rosh Hashanah (the Jewish new year) and Yom Kippur (the Day of Atonement), and refusing to

recognize certain Jewish fast days.  (2d Am. Compl. 2–3. 10–12, Dkt. No. 73.)

**A.  Kosher Meals**

In support of his claim regarding kosher meals, Estes alleges that, as an Orthodox Jew, it

is a central tenet of his Jewish beliefs that he should only eat kosher food, as mandated by

Orthodox Jewish law.[5]  VDOC and River North provide Jewish inmates who demonstrate

religious sincerity and who wish to eat kosher with a common fare diet, which Estes receives.

Estes avers that it is his belief that the common fare diet at River North does not comply with

Orthodox Jewish kosher standards and is not an acceptable alternative to a kosher diet for a

person with his religious beliefs, but he nonetheless participates in the common fare diet because

River North does not provide any alternative religious diet to inmates.  Estes states that he does

not see the food labels, so he has no way to confirm whether the food provided on the common

---

[3]  The court notes that while his complaint is unverified, Estes provides an affidavit in support of his motion for summary judgment which addresses some of the claims raised in the second amended complaint.

[4]  A Shofar is a horn of a kosher animal with the marrow removed.  According to Estes's complaint, Jewish law mandates that all Jews must hear the blowing of a series of blasts on the Shofar during the morning prayers of Rosh Hashanah and at the end of Yom Kippur.

[5]  Kosher dietary laws "mandate more than just pork-free food and include, among many other things, directives on what food needs to be purchased; how food needs to be stored, prepared, cooked, and served (and these factors all vary by food type and temperature); and how to clean any items that come in contact with food.  Further, food that would otherwise be kosher can become nonkosher if, for example, it is mixed with nonkosher food or brought into contact with utensils that have been used in the preparation of nonkosher food."  (Kranz Expert Rep. ¶ 13, Dkt. No. 123-1.)

fare diet is actually kosher.  (Estes Decl. ¶¶ 5, 9–13, Dkt. No. 122; Kranz Expert Rep. ¶ 21, Dkt. No. 123-1.)

Estes filed an affidavit stating that even if the food used in the common fare diet is kosher when it is purchased, he believes VDOC engages in practices prior to serving the food to him that render the common fare diet food to be non-kosher.  Estes, however, does not state that he has personally observed any of these alleged practices or that he has been in either the common fare diet or regular diet kitchens.  By way of example, Estes believes that the common fare diet trays are washed in the same dishwashers as the regular diet food trays; the oven used to cook common fare food previously was used to cook regular diet food and is located in the regular diet kitchen area; the kitchen in which common fare diet food is prepared has never been certified as kosher by any authority on Jewish dietary laws; the preparation of common fare diet food is not supervised by any authority on Jewish dietary laws; common fare diet meals are served on the same steam tables as regular diet meals; and fruit on the common fare diet menu is sliced with non-kosher knives.  (Estes Decl. ¶ 14, Dkt. No. 122.)

VDOC developed the common fare diet to meet the dietary needs of offenders who, for religious reasons, require a kosher, Halal, or non-pork diet and whose dietary requirements cannot be accommodated with foods provided by the regular food diet.  Preparation and service of common fare diet food items are governed by VDOC's Food Service Manual.  River North is in "full compliance" with the guidelines set forth in the Food Service Manual.  River North has two to three inmate workers who are assigned to work exclusively in the common fare diet area at the facility, and they are trained and knowledgeable in common fare diet procedures; however, they are not trained in Jewish dietary laws.  Food Service Managers continually monitor the common fare diet food preparation areas and workers to ensure that the common fare diet

policies are being followed. If a kitchen worker violated policy, he would be subject to discipline and loss of his job. (Engelke Aff. ¶¶ 4–5, Dkt. No. 126-2; Gregg Aff. ¶ 5, Dkt. No. 126-10; Morrison Aff. ¶¶ 4–5, Dkt. No. 126-12; Engelke Dep. 47, Dkt. No. 125-2.)

Pursuant to VDOC policy, only authorized food items are served on the common fare diet menu.[6] All foods purchased and used for the common fare diet are consistent with or certified kosher by a recognized Orthodox Standard, such as a "U," "K," or "CRC," or they are certified halal. According to policy, River North staff verifies that the kosher food purchased for the common fare diet is kosher by visually inspecting the symbols on the packaging. All kosher and non-kosher food items are stored separately. The inmates working in the food storage area check for kosher labeling on the food items. (Engelke Aff. ¶ 6; Morrison Aff. ¶¶ 7–8.)

The common fare diet does not mix meat and dairy. The only meat offered on the common fare diet menu is tuna. Fruits and vegetables offered at VDOC facilities are routinely inspected for freshness, and they are properly cleaned before serving. When it is time for meal preparation, the common fare diet kitchen worker will retrieve the food items that he needs and take them to the common fare diet room. Common fare diet meals are prepared in an area separate from the regular diet meal preparation, with separate utensils and with designated common fare diet equipment. There is a common fare diet cooler area and a common fare diet warming area. Hot common fare diet meals are prepared on designated hot plates, steamers, or kettles in a designated area of the kitchen. The same steam table is used for both common fare diet and regular diet food, but it is not used for both diets at the same time. The steam table is cleaned and sanitized between uses. The oven used for preparing certain common fare diet food items is located in the regular diet area, but is labeled "common fare only" and is utilized only

_____

[6] The court notes, however, that plaintiff's expert, Rabbi Kranz, contends that some of the food items on the common fare diet lack proper kosher certification. (Kranz Expert Rep. ¶ 25.)

for cooking common fare diet food items.  There is also a tilt skillet that is exclusively for preparation of common fare diet food items.  Kosher and non-kosher food items are kept separate at all times.  The common fare diet food is not prepared outside the common fare kitchen except when using the oven.  (Engelke Aff. ¶ 7; Morrison Aff. ¶¶ 8–10.)

After inmates finish eating a common fare diet meal, they place their trays into a tray slot that is connected to the "tray room."  The regular diet trays are cleaned first, and then the dishwasher is broken down; taken apart; washed, rinsed, and sanitized inside and out; and put back together to then be used for cleaning the common fare diet trays, lids, and cups.  The common fare diet trays are placed on drying racks labeled for common fare diet use.  All eating utensils are disposable.  Cooking utensils are cleaned in a separate common fare diet sink. (Morrison Aff. ¶¶ 11–13.)

According to the only expert in the case, Orthodox Rabbi Yossel Kranz,[7] "the common fair diet provided by VADOC to inmates at River North, including Mr. Estes, does not comply with the laws of Kashrut [kosher], and the common fare diet is not an acceptable diet for Jewish inmates who follow the laws of Kashrut."  (Kranz Expert Rep. ¶ 11.)  While he did not inspect any VDOC facility for purposes of his report, he "would not certify River North's common fare kitchen as kosher."  (*Id.* ¶ 18.)  Rabbi Kranz explains that the laws of Kashrut *require* that food be prepared with "rabbinical oversight or supervision by a Jew knowledgeable in the laws of Kashrut and strictly adherent to those laws in one's personal life" and that such supervision does not occur at River North.  (*Id.* ¶¶ 21–22.)  He explained that it is assumed that a person without a

---

[7] The fact witness for defendants, Rabbi Schectman, who is only considered for purposes of defendants' motion, does not state whether he is an Orthodox rabbi.  In any event, he comments only on his inspection of the River North kitchen on one day.  He did make recommendations for purification of serving line counters, wells, and the racks used for common fare trays, and defendants apparently have adopted those recommendations.  (Schectman Aff. ¶ 5, Dkt. No. 126-5; Defs' Mem. Supp. Mot. Summ. J. 9, Dkt. No. 126.)

personal commitment to Judaism and kosher food cannot be entrusted with the responsibility of protecting the integrity of the laws of Kashrut. (*Id.*) As an example, such supervision is required in restaurants that are certified kosher. (Kranz Dep. 26, Dkt. No. 126-15.) Supervision is, in other words, "part and parcel of the laws of kosher …." (*Id.* at 38.) Notably, it is "undisputed that there is no rabbinical supervision and there is no specific training as to Jewish dietary laws" at River North. (Defs.' Opp'n to Pl.'s Mot. Summ. J. 12; Dkt. No. 132.) Defendants point out, however, that Rabbi Kranz agrees that "supervision doesn't make things kosher; it just ensures that they are kosher." (Kranz Dep. 27.)

It is also undisputed that kosher food can become non-kosher depending upon how it is prepared and handled. The parties differ, though, as to whether VDOC procedures render the kosher foods non-kosher. Defendants note the separation of the foods, utensils, etc., and their cleaning procedures. They also note the separate areas for storage and preparation and the cleaning of any shared spaces between common fare and other diets. On the other hand, Rabbi Kranz notes likelihoods, possibilities, and risks of contamination or non-compliance, but cannot be definitive. His report notes that: VDOC procedures "do not create an environment that is likely to comply with the laws of Kashrut"; the method of cooking "invites a host of problems"; and there is a "risk of impermissible contact between those common fare items and nonkosher food residue . . . potentially rending those common fare food items and utensils not kosher . . . ." (Kranz Expert Rep. 14, 15, 19.) He proposes that, in lieu of North River's kitchen use of rabbinical supervision, VDOC could use kosher prepackaged meals as an alternative.

## B. Costs of Alternatives

Defendants claim that the proposed alternatives are not only necessary, but also too costly. They state that VDOC used to provide prepackaged meals to certain offenders three

times a week, but it proved too costly.  (Engelke Aff. ¶ 10.)  Prior to implementing the common

fare diet, prepackaged meals were provided to Nation of Islam inmates at one correctional

facility.  Based on that experience, defendants estimate that the daily cost to provide kosher

prepackaged meals per offender would be $8.50 and the current VDOC budget is $2.10.  (*Id.*)

The federal government is said to incur costs of $6.19 per inmate per day for prepackaged meals.

(*Id.* ¶ 11.)  Defendants state that the common fare diet is available at 17 facilities and that VDOC

serves meals to approximately 30,066 inmates.  (Robinson Aff. ¶ 8, Dkt. No. 126-11.)  However,

only 3,000 inmates receive the common fare diet.  (Engelke Aff. ¶ 10.)  There is no information,

however, regarding the number of offenders that want a kosher meal for religious reasons or the

estimated cost of providing kosher prepackaged meals, and defendants did not ascertain that

information.  (Engelke Dep. 29, 92, 102.)  Defendants do assert that an Orthodox Jewish

organization considers there to be 18 VDOC Orthodox Jewish offenders, if you include Estes.

(Morris Aff. ¶ 4, Dkt. No. 126-13.)  The annual cost if all of these offenders requested

prepackaged meals would be an increased cost of $42,048 (at a cost of $8.50 per day per

offender).  Without prepackaged meals, VDOC estimates an annual cost of over $100,000 for

each of the facilities that serve the common fare diet (17 of them) to hire individuals to supervise

all of the common fare meals.  (Robinson Aff. ¶ 8.)

**C.  Passover**

     In support of his claim regarding Passover, Estes states that the common fare diet meals

which are provided to him on the Jewish holiday of Passover are not kosher-for-Passover in

accordance with Orthodox Jewish standards.  Estes does not explain how the common fare diet's

Passover meals violate his religious beliefs, but Rabbi Kranz describes the Orthodox Jewish

standards pertaining to Passover.  Rabbi Kranz states that to "make even the most mundane

kitchen kosher-for-Passover is a truly difficult task, and the procedures are intricate and complex and require expertise and supervision to be done correctly." He explains that, in any kitchen, all interior surfaces of the oven and stovetop must be treated with a blow torch; the oven must be made to glow red hot for a specified time; every exposed surface in the kitchen, including the outside surface of the oven, stovetop, counter top, cabinet shelves, and storage shelves, but excluding the ceiling, floor, and doors, must be cleaned and then covered; and all utensils made of metal and glass, and all pots, pans, plates, cups, and dishes must be placed in boiling water under proper supervision for a specified time. (Estes Decl. ¶ 15; Kranz Expert Rep. ¶¶ 26–27.)

During Passover, River North offers Passover meals from the common fare diet menu that are free of leavened food items, legumes, and grains. Matzah is substituted for leavened food items. In addition to the Passover meals offered at the facility, inmates have access to kosher-for-Passover meals from the commissary. In 2015, the kosher-for-Passover commissary selection was limited to kosher matzah, kosher chocolate, macaroons, and gefilte fish because inmates at Security Level 4 facilities, such as River North, did not have access to microwaves to be able to cook hot meals on their own. In 2016, River North had microwaves available to inmates and, thus, chicken and matzo ball soup, beef stew, and chicken with potatoes were added to the kosher-for-Passover commissary selections. In 2017, VDOC also approved donations of kosher-for-Passover food for individual inmates from various groups and synagogues. (Kanode Aff. ¶¶ 14–15, Dkt. No. 126-1.)

### D. Shofar

In support of his claim regarding the Shofar, Estes states that Jewish law mandates the blowing of the Shofar during prayer services on the high holidays of Rosh Hashanah and Yom Kippur. Estes requested permission to use a Shofar on these days, and VDOC and River North

have refused his requests based on concerns that the horn could be used as a weapon or create a health concern if inmates were allowed to possess it. (Estes Decl. ¶¶ 22–23; 2d Am. Compl. 10–11.)

## E. Fasting Days

In support of his claim regarding fasting days, Estes states that Jewish law mandates observance of several fast days each year which end at nightfall when fasts are then broken. Estes avers that VDOC does not recognize the three fast days of: Asara b'Tevet, Shivah Asar B'Tammuz, and Tisha b'Av.[8] He states that he has requested that VDOC and River North accommodate his religious exercise by serving him dinner after the conclusion of these fast days and that their refusal to do so "forces [him] to violate core religious Jewish doctrine." The second amended complaint argues that Estes cannot simply refuse his common fare diet trays on these fast days because doing so would risk his suspension or removal from the common fare diet as inmates are required to take at least seventy-five percent of common fare meals served each month. The second amended complaint also argues that fasting until the morning following the fast days causes hunger and pain for Estes, although Estes does not say this in his affidavit. (Estes Decl. ¶¶ 18–21; 2d Am. Compl. 11–12.)

## II. DISCUSSION

## A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is precluded only if the dispute about a material fact is "'genuine,' that is, if the evidence is such that a reasonable jury

---

[8] The court notes that these one of these fast days occurs in the winter months and two occur approximately three weeks apart during the summer months.

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. 249–50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56. *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). Instead, the evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Anderson*, 477 U.S. at 252; *see also Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

**B. RLUIPA**

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that" the burden is "in furtherance of a compelling governmental interest[] and [] is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a).

A substantial burden on religious exercise occurs when a government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion. *See, e.g.*, *Krieger v. Brown*, 496 F. App'x 322, 324 (4th Cir. 2012); *Adkins v. Kaspar*, 393 F.3d 559, 567 n.32 (5th Cir. 2004); *Civil Liberties for Urban Believers v. Chicago*, 342 F.3d 752, 760 (7th Cir. 2003). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his religion." *Krieger*, 496 F. App'x at 325 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a . . . plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011). No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion.

*Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Once a plaintiff produces *prima facie* evidence to support the claim that the challenged practice or law substantially burdens the plaintiff's exercise of religion, the government bears the burden of persuasion on whether the practice or law is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-2(b). "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015) (quoting *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015)) (internal quotation marks and citations omitted). "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 135 S. Ct. at 864 (citations omitted). Courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (citations omitted) (internal quotation marks omitted). "RLUIPA . . . is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs." *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (citation omitted). However, courts should not "mechanically accept" prison administrators' rationale for restricting religious exercise. *Lovelace*, 472 F.3d at 190.

RLUIPA does not authorize an award of damages against state officials sued in their individual capacities, *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009), and the Eleventh

Amendment bars a recovery of damages under RLUIPA against state officials sued in their official capacities, *Madison v. Virginia*, 474 F.3d 118, 133 (4th Cir. 2006).

### 1. Kosher diet

Estes avers that he must eat kosher in accordance with Orthodox Jewish law. He argues that the common fare diet that he receives at River North is not kosher because there are no procedures in place to ensure compliance with kosher dietary laws. Rabbi Kranz confirms this. According to Rabbi Kranz, the kosher diet can be supervised by a rabbi or a Jew who is both knowledgeable in Jewish dietary laws and strictly adherent to those laws in his personal life. While the court refers to this supervision as "rabbinical supervision," the court understands that the supervision does not necessarily require a rabbi.

Defendants concede that there is no rabbinical supervision, or supervision by those that are trained in the laws of Kashrut, over the common fare diet. However, they argue that a lack of supervision does not make kosher food non-kosher, as admitted by Rabbi Kranz, and Estes has not come forward with sufficient proof that he has consumed non-kosher food.[9] Defendants assert that, because Estes lacks this proof, he cannot show a substantial burden on the exercise of his religion. They argue that Estes is urging the court to apply "religious law," but that the court is bound instead by federal law.

Defendants conveniently overlook the fact that courts, in applying federal law (RLUIPA in this case), look to the religious beliefs of an individual plaintiff. A substantial burden on religious exercise occurs when a government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate *his beliefs*." *Lovelace*, 472 F.3d at

---

[9] Rabbi Kranz also opines that the common fare diet provided by VDOC does not comply with the laws of Kashrut and is not acceptable for Jewish inmates who follow those laws. Because of the court's ruling, though, it need not decide whether there are genuine disputes of fact as to whether the food, preparation, separation, and cleaning are sufficient to render the meal kosher or non-kosher.

187 (emphasis added).  Although defendants argue that Estes already receives a kosher diet, there is no dispute that there is no rabbinical supervision over the sourcing, preparation, cooking, or serving of common fare diet meals at River North, as required by Estes's religious beliefs. Accordingly, the court finds that Estes has established a substantial burden on his religious exercise.

Having made that finding, the burden shifts to the defendants to show that the substantial burden on religious exercise is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a).  The court finds that the defendants have not met their burden of persuasion.  Defendants argue that their provision of the common fare diet survives RLUIPA scrutiny because it is "narrowly tailored to further compelling governmental interests, such as controlling costs and providing an administratively workable program to provide offender meals."  (Defs.' Mem. Supp. Mot. Summ. J. 2, Dkt. No. 126.)  With regard to cost, defendants state that providing pre-packaged meals, as suggested by Estes, is cost- prohibitive.  (*Id.* at 12.)  As already noted, defendants submit that VDOC's current budget for inmate meals is $2.10 per inmate, per day.  (Engelke Aff. ¶ 10.)  VDOC's Director of Food Services, Mark Engelke, estimates that pre-packaged meals would cost $8.50 per inmate, per day and states that the Federal Bureau of Prisons spends $6.19 per inmate.[10]  (*Id.* ¶¶ 10–11.) While Engelke states that there are 3,000 inmates currently participating in the common fare diet program within VDOC, (*id.* ¶ 10), there is no evidence indicating how many inmates within VDOC would want certified kosher meals to accommodate their religious beliefs.  An Orthodox Jewish organization has identified only 17 Jewish offenders in VDOC, so including plaintiff the increased annual cost if all of these offenders requested a certified, prepackaged, kosher diet

---

[10]  Engelke does not specify if the $6.19 per inmate is a daily budget or some other measure.  He also does not indicate whether these pre-packaged meals are kosher according to Jewish dietary laws.

would be approximately $42,048.[11]  Moreover, defendants do not assert how accommodating

Estes, alone, is cost prohibitive.  In evaluating whether there is a compelling interest, though, the

challenged policy is evaluated as applied "to the person—the particular claimant whose sincere

exercise of religion is being substantially burdened."  *Burwell v. Hobby Lobby Stores, Inc.*, 134

S. Ct. 2751, 2779 (2014).  This individualized analysis requires the court to "loo[k] beyond

broadly formulated interests" and to "scrutiniz[e] the asserted harm of granting specific

exemptions to particular religious claimants." *Id.* at 2779; *see also Holt*, 135 S. Ct. at 863

(emphasizing that RLUIPA requires a "focused inquiry" as to "the particular claimant").

Defendants also state that hiring rabbinical supervisors at each of the 17 VDOC facilities

that serve the common fare diet would be cost prohibitive.  (Robinson Aff. ¶ 8, Dkt. No. 126,

attach 11.)  The Chief of Corrections Operations, David Robinson, estimates that it would cost

over $1.7 million to provide proper rabbinical supervision at each of the common fare diet

facilities.  (*Id.*)  However, defendants provide the court no context to this figure as it relates to

VDOC's overall budget.  Moreover, the defendants do not explain why each of the 17 common

fare diet facilities would need rabbinical supervision in order to accommodate Estes's religious

beliefs, rather than only River North, or even a few VDOC facilities.

With regard to administrative concerns, defendants assert that accommodating "numerous

religious diets presents other significant operational issues and costs," (Defs.' Mem. Supp. Mot.

Summ. J. 12),  including longer dining hours, increased inmate movement, and increased need

for security staffing.  Defendants argue that the common fare diet program allows VDOC to

"reduces costs and promote efficiency" by being a "single, centralized food program."  (*Id.* at

---

[11]  The court further notes that, as recognized by *Hobby Lobby*, RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761–62 (2014); 42 U.S.C. § 2000cc-3(c).

26.)  However, Estes does not necessarily seek a separate diet; he seeks a diet that the defendants argue they are already providing, but with the added element of rabbinical supervision.  If the common fare diet is kosher, as they argue it is, defendants need only add the requisite rabbinical supervision in order to accommodate Estes's religious beliefs.  Thus, the court does not find defendants' argument as to administrative concerns persuasive.

Based on the foregoing, even if costs and administrative concerns were compelling governmental interests here, the court finds that defendants have not demonstrated that the common fare diet, as currently administered to Estes, is the least restrictive means of furthering those interests in cost containment or administrative concerns.  As the United States Supreme Court has stated, "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.  If a less restrictive means is available for the Government to achieve its goals, the Government must use it."  *Holt*, 135 S. Ct. at 864 (internal citations and alterations omitted).  The government has not shown that it lacks other means of achieving its desired goal without burdening Estes's exercise of religion.  Accordingly, the court will deny defendants' motion for summary judgment and will grant Estes's motion for summary judgment as to this claim.[12]

### 2.  Passover

With regard to Estes's Passover claim, the court finds that he has not demonstrated that the defendants have substantially burdened his religious beliefs.  There is no dispute that River

---

[12]  Although neither party specifically discusses how other states accommodate similar religious beliefs of inmates, consideration could be given to housing all inmates who require rabbinical supervision at one facility with either prepackaged meals (as VDOC did for Nation of Islam followers), or a rabbi, or an individual trained in the laws of Kashrut.  Consideration could also be given to training in the laws of Kashrut with periodic review or video supervision by a rabbi.

North does not prepare the common-fare-diet kitchen for Passover in the manner described by Rabbi Kranz. However, Estes does not allege that the kosher-for-Passover options available for order from the commissary are inadequate or non-kosher. The fact that he has to pay for those options does not create a substantial burden, especially since the evidence before the court demonstrates that Estes is capable of making purchases from the commissary. *See Living Water Church of God*, 258 F. App'x at 739 (holding that no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion). Accordingly, the court finds that Estes has not met his burden. Defendants' motion for summary judgment will be granted and Estes's motion for summary judgment will be denied as to this claim.

### 3. Shofar

Estes also alleges that defendants have substantially burdened his religious exercise by not allowing him to hear the blowing of the Shofar during two Jewish holidays, as mandated by Jewish law. After Estes filed this action, defendants agreed to obtain a recording of the appropriate Shofar blasts for each of the holidays to provide to inmates who wish to hear them during the holiday ceremonies. (Welch Aff. ¶¶ 5–6, Dkt. No. 151-1.) Estes contends, however, that a recording of the Shofar blasts does not comply with Jewish law. Rather, the Shofar must be blown contemporaneously during the ceremonies, and the observant must hear the Shofar live. Before filing this action, Estes sought permission to use the Shofar during the religious holidays. (2d Am. Compl. ¶ 49, Dkt. No. 73.) Estes's request was denied on the basis that the Shofar could be used as a weapon. (Defs.' Mem. Supp. Mot. Summ. J. 36.) Defendants also argue that allowing individual inmates to blow the Shofar poses a health concern regarding

contamination.  (*Id.* at 37.)  For his part, Estes suggests that defendants' concerns of the Shofar being used as a weapon and causing health issues could be addressed, while still satisfying Jewish law, if VDOC arranged for someone well-versed in the laws and art of blowing the Shofar to visit the prison on the two Jewish holidays to perform the blasts.  (Pl.'s Resp. Opp'n to Mot. Summ. J. 31, Dkt. No. 127.)

Having considered the parties' arguments and proposed solutions, the court finds that a material dispute of fact exists as to whether the recorded Shofar blasts are the least restrictive means; thus, the court will deny both Estes's and defendants' motions for summary judgment as to this claim.

### 4. Fasting days

Estes alleges that defendants also have placed a substantial burden on his religious exercise by not providing him a meal after nightfall on three fasting days that are observed under Jewish law.  The court finds that Estes has not established a substantial burden on his religious exercise because he has not demonstrated that he has been pressured to modify his behavior and to violate his beliefs.  *See Lovelace*, 472 F.3d at 187.

Estes may fast on these three fasting days without River North or VDOC recognizing them.  Estes argues that he cannot refuse his meal trays on those days because he risks suspension from the common fare diet based upon the requirement that he take at least seventy-five percent of the common fare meals served in a month.  However, even if Estes refused three meal trays on the fasting day, those three meals do not exceed the twenty-five percent of meals that he is allowed to miss in a month.[13]  Further, even though Estes is required to take seventy-

---

[13]  The court also notes that six meals over two fasting days that might fall within the same month also do not constitute the twenty-five percent of meals he is permitted to miss in a month.

five percent of the meals served in a month, there is no requirement that he *eat* all of those meals. Thus, Estes could take the meal trays on the fasting days and not eat the meals.

Estes's complaint also argues that by not serving him a meal after nightfall on the fasting days, defendants are "extending the period of [his] fasts until breakfast the following day, which results in hunger and pain for [] Estes."[14]  However, Estes is permitted to make food purchases from the commissary; indeed, the record shows that Estes has done so.  Thus, he could eat food that he purchased from the commissary to break his fast before breakfast the next day.  *See Living Water Church of God*, 258 F. App'x at 739 (nothing that the government's causing religious exercise to be more expensive does not, in itself, constitute a substantial burden). Inasmuch as Estes is able to observe the fasting days—regardless of whether River North or VDOC recognizes those days or provides him a special meal to break his fast—the court finds that Estes has not established a substantial burden on his religious exercise.  Therefore, the court will grant defendants' motion for summary judgment and will deny Estes's motion for summary judgment as to this claim.

**C.  Virginia RFRA**

Estes alleges that defendants also have violated the Virginia Religious Freedom and Restoration Act (Virginia RFRA).  The Virginia RFRA provides that:

> No government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability unless it demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest.

Va. Code § 57-2.02(B).

---

[14]  Estes does not state this in his affidavit, but it is in his complaint.

As defined by this section, "government entity" means "any branch, department, agency, or instrumentality of state government, or any official or other person acting under color of state law, or any political subdivision of the Commonwealth and *does not include the Department of Corrections . . . .*" Va. Code § 57-2.02(A) (emphasis added). In response to defendants' motion for summary judgment, Estes contends that although the Virginia RFRA does not apply to VDOC, it still applies to "those acting on behalf of" VDOC. (Pl.'s Resp. Opp'n to Mot. Summ. J. 32.) Estes provides no support for this argument, and the court finds it unpersuasive. Because the Virginia RFRA does not apply to VDOC and all of the defendants are VDOC employees, the court grants defendants' motion for summary judgment and denies Estes's motion for summary judgment as to this claim.

### D. Requested Dismissal of Defendants Ponton and Hall

Defendants seek the dismissal of defendants Ponton and Hall because they are not alleged to have been personally involved in any RLUIPA violations and they lack the ability to effectuate or enforce a change in VDOC policy. Ponton is the Western Regional Director of VDOC and oversees the correctional institutions in the Western Region—one of which is River North. (Ponton Aff. ¶¶ 1, 4, Dkt. No. 126-6.) According to his affidavit, he has no duties regarding approving meals for inmates or approving certain religious observances or programs at River North. (*Id.* ¶ 5.) Hall is a Unit Manager at River North and previously served as the Institutional Programs Manager there. (Hall Aff. ¶ 1, Dkt. No. 126-8.) As Programs Manager, he was responsible for scheduling and monitoring counseling service programs and religious service programs, but had no responsibilities with regard to the development or implementation of the common fare program or responsibility for approving or denying approval of religious observances or programs at River North. (*Id.* ¶¶ 4–6.)

While Ponton has no duties with regard to meals, because he oversees River North as the Western Regional Director, he is a proper defendant. Hall, however, is now a Unit Manager. He is no longer the Programs Manager. There is no evidence to indicate that as a Unit Manager, Hall's duties would include any matters related to serving certified-kosher meals to Estes or with regard to the remaining issue regarding the blowing of the Shofar. In other words, his dismissal would have no affect on the relief provided to Estes. Therefore, Hall will be dismissed as a defendant.

**E. Scope of Declaratory and Injunctive Relief**

The court notes that none of the parties have briefed the scope of the appropriate declaratory and injunctive relief in this case or the requirements of an injunction under RLUIPA and/or the Prison Litigation Reform Act (PLRA). The court will address these issues at the conclusion of the trial.

## III. CONCLUSION

For the reasons stated herein, Estes's motion for summary judgment is granted in part and denied in part and defendants' motion for summary judgment is granted in part and denied in part. An appropriate order with these rulings and other rulings addressed in this opinion will be entered.

Entered: June 5, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge